# United States Court of Appeals
## For the First Circuit

No. 19-1232

UNITED STATES OF AMERICA,

Appellee,

v.

MOUSFAFA MOATAZ ABOSHADY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Joshua N. Ruby, with whom Peter E. Gelhaar, George W. Vien, and Donnelly, Conroy & Gelhaar, LLP were on brief, for appellant.
Ross B. Goldman, Attorney, United States Department of Justice, Criminal Division, with whom Andrew E. Lelling, United States Attorney, David G. Lazarus, Assistant United States Attorney, Abraham R. George, Assistant United States Attorney, Brian A. Benczkowski, Assistant Attorney General, and Matthew S. Miner, Deputy Assistant Attorney General, were on brief, for appellee.

February 20, 2020

**BARRON**, **Circuit Judge**. Moustafa Aboshady ("Aboshady") challenges his 2018 federal convictions arising from a healthcare fraud conspiracy. We affirm.

## I.

In March 2014, Fathalla Mashali, Aboshady's uncle, was indicted and, in 2017, he pleaded guilty in the United States District Court for the District of Massachusetts to a multi-million-dollar healthcare fraud that he perpetrated through New England Pain Associates ("NEPA"), which Mashali owned. Mashali committed this fraud against both government and private insurers by coordinating the fraudulent documentation of non-existent medical services in patients' medical records to justify reimbursement for services not rendered.

From 2010 to 2013, Aboshady worked for Mashali in the billing department of NEPA, which had four clinical pain-management offices in New England, though its billing office was located in Cairo, Egypt. When billers would send audit requests, employees in the billing department, including allegedly Aboshady, would "get the information together" and send it to the billers for them to then submit to the insurer.

In connection with the fraud for which Mashali had been convicted, Aboshady was indicted on various federal charges in the United States District Court for the District of Massachusetts on September 27, 2016. The indictment was for one count of conspiracy

- 3 -

to make false statements and to conceal in connection with healthcare benefit programs, in violation of 18 U.S.C. § 371, and two counts of false statements in connection with healthcare benefit programs, in violation of 18 U.S.C. § 1035.

Aboshady pleaded not guilty to the charges against him, and a trial ensued. The jury found Aboshady guilty on all three counts, and the District Court sentenced Aboshady to 75 months in prison. He then timely filed this appeal.

## II.

Aboshady's first set of challenges to his convictions concerns the District Court's denial of his December 2017 motion to suppress data that the government had acquired pursuant to a 2014 warrant. That warrant authorized the search and seizure of certain electronic data contained in six Gmail accounts, including Aboshady's. The warrant provided that it was to be executed on Google, Inc.[1]

We review a district court's findings of fact in denying a motion to suppress for clear error and its conclusions of law de

---

[1] Below, in addition to filing his motion to suppress with the District Court, Aboshady also moved to compel discovery before the federal magistrate judge who had issued the search warrant to obtain information relating to the government's seizure of material obtained from Google via the warrant. The Magistrate Judge held a hearing on that motion but then denied it in a written decision. Aboshady sought review of that ruling from the District Court. Based in part on the Magistrate Judge's findings, the District Court denied the motion in a written opinion. Aboshady does not appeal that ruling to us.

novo. See United States v. Almeida, 748 F.3d 41, 47 (1st Cir. 2014). Because "[s]uppression of evidence . . . has always been our last resort, not our first impulse," Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016), it is permitted only when the government's conduct in searching or seizing the evidence in question reflects a "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," Davis v. United States, 564 U.S. 229, 238 (2011) (internal quotation marks omitted) (quoting Herring v. United States, 555 U.S. 135, 144 (2009)).

Aboshady argues that the District Court erred in denying his suppression motion because the government executed the warrant in a manner that reflects a flagrant disregard of the warrant's terms. He contends that this flagrant error in execution occurred because the government required Google, Inc. to hand over a drive that held all of the data in Aboshady's account, including certain electronic documents that contained very personal information of his, and then, in preparation for trial, retained all of that data and possibly searched it (including in those searches the electronic documents within that data that contained that personal information). Aboshady appears to premise this contention on an assertion that the warrant did not permit the government to retain for as long as it did either his personal emails or any of the other electronic documents contained within the data that the government had acquired from Google, Inc. He also appears to

- 5 -

contend that the warrant did not permit the government to then search the personal information contained in the emails and the electronic documents to which he refers.

We begin by considering what the record shows about the government's execution of the warrant on Google, Inc. Section II of the warrant, which is entitled "Accounts and Files to be Copied by Google, Inc. Personnel[,]" clearly states that Google, Inc. was to copy "[a]ll data files associated with . . . tifaaboshady@gmail.com" and that "Google, Inc. will provide th[at] account duplicate to law enforcement personnel. Law enforcement personnel will then search the account duplicate for the records and data to be seized." In accord with the plain terms of that section of the warrant, the government executed the warrant on Google, Inc., and, in response, the company produced a duplicate data file of Aboshady's Gmail account, including the personal emails that he singles out. Subsequently, in accord with the plain terms of that section of the warrant, personnel from the Federal Bureau of Investigation ("FBI") who were not part of the prosecution team then uploaded to a searchable database the estimated 430,081 documents contained in the data file that Google, Inc. had turned over, applied search terms to filter out potentially privileged communications, and then turned the

database over to the investigative team.[2]  Thus, we see no violation of the warrant, let alone a flagrant one, in either the government's execution of the warrant on Google, Inc. or its subsequent creation of the database.

We turn, then, to the government's execution of the warrant once that database had been created.  As this aspect of the government's execution does not implicate Section II of the warrant, we focus, as Aboshady does, on Section III, which is entitled "Records and Data to be Searched and Seized by Law Enforcement Personnel."  That section of the warrant states that the government is authorized to search within, and to seize from, the data that it has acquired from Google, Inc. pursuant to Section II the following: "[a]ll communications between or among" the six accounts; "[a]ll communications pertaining to patient records, billing, and/or claims for payment relating to NEPA patients"; records relating to "[t]he identity of the person or persons who have owned or operated the e-mail accounts"; the "existence and identity of any co-conspirators"; and "[t]he travel or whereabouts of" the owners of the six accounts.

---

[2] We note that Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information.  Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."  Fed. R. Crim. P. 41(e)(2)(B).

Aboshady argues that the government impermissibly interpreted the provision in Section III that gives the government "authorization to seize records relating to the <u>identity</u> of the operators of the relevant email accounts" to mean "that <u>every</u> email in Dr. Aboshady's account falls within the terms of the warrant." (First emphasis added). Aboshady asserts that such an interpretation is implausible, because it would allow the government to search and seize every email (including any attachments to it) that was sent or received from the email address, "tifaaboshady@gmail.com," just by virtue of the fact that the email had been sent to or received by that email address.

Aboshady asserts that such a broad interpretation of the warrant would conflict with both the "Fourth Amendment's particularity and reasonableness requirements" and "[t]he structure of the warrant." As to that latter contention, he points to the fact that the warrant contains distinct sections -- namely, Section II and Section III -- and argues that, when this feature of the warrant is "combined with the different categories listed in the separate sections of the warrant," the warrant clearly "implies that the set of data described in Section III of the warrant is more restricted than the universe of [S]ection II." Aboshady then proceeds to describe, albeit briefly, "[t]he non-seizable documents retained by the government" pursuant to what he contends was its impermissible interpretation of Section III to

"include email communications between Dr. Aboshady and his wife, sensitive financial and medical information, and numerous personal and sensitive photographs. Examples include emails Dr. Aboshady wrote to his family members updating them on the progress of his wife's labor, accompanied by photographs of his wife in the delivery room."

As far as we are aware, the government continues to hold all of the data contained in the database and thus the electronic documents that contain the personal information that Aboshady specifically contends that the government impermissibly retained pursuant to what he asserts is its flagrantly overbroad construction of the word "identity" in Section III. It also appears that the government intends to keep the entirety of that data until the end of Aboshady's criminal appeals.

Nothing in Section III or anything else in the warrant, however, sets forth a time limit on the retention of the data that Section II plainly authorized the government to acquire from Google, Inc. And, given the absence of any such time limit, we do not see why it would be unreasonable to interpret the warrant to permit the government to retain that data until the appeals are completed, see United States v. Ramirez, 523 U.S. 65, 71 (1998) (describing how the "touchstone of reasonableness . . . governs the method of execution of the warrant"), let alone why it would be so unreasonable to so construe it that suppression would be

required here.  See United States v. Ganias, 824 F.3d 199, 213-15 (2d Cir. 2016) (en banc) ("[I]n assessing the reasonableness, for Fourth Amendment purposes, . . . [p]reservation of the original medium or a complete mirror may therefore be necessary in order to safeguard the integrity of evidence that has been lawfully obtained or to authenticate it at trial."); id. at 215 ("Retention of the original storage medium or its mirror may also be necessary to afford criminal defendants access to that medium . . . so that . . .  they may challenge the authenticity or reliability of evidence allegedly retrieved."); United States v. Ulbricht, 858 F.3d 71, 99-100 (2d Cir. 2017) (noting that due to the "nature of digital storage, it is not always feasible to extract and segregate responsive data from non-responsive data" (internal quotation marks and citation omitted)).  The pre-digital age precedents that Aboshady points to in arguing otherwise, moreover, are not to the contrary.  See Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976) (discussing the return of non-responsive documents in the pre-digital era); United States v. Tamura, 694 F.2d 591, 595-97 (9th Cir. 1982) (same); United States v. Abrams, 615 F.2d 541, 543 (1st Cir. 1980) (describing how the warrant at issue failed to meet the requirement of particularly when it did not provide a limitation as to what records could be seized).

To the extent that Aboshady means to argue that the government's execution of the warrant flagrantly violated its

- 10 -

terms because the government not only retained the data that it had acquired from Google, Inc. pursuant to Section II of the warrant but also may have run searches on that data for years afterwards "as it developed new theories" of his possible criminal liability, we also are not persuaded. An "unreasonable delay" in conducting a search that had been authorized by a warrant could "result[] in the lapse of probable cause," United States v. Syphers, 426 F.3d 461, 469 (1st Cir. 2005) (quoting United States v. Marin-Buitrago, 734 F.2d 889, 894 (2d Cir. 1984)),[3] but there is no evidence in the record here that suffices to show that probable cause had lapsed at the time that any particular search of the data may have been conducted, see United States v. Arnott, 758 F.3d 40, 45 n.6 (1st Cir. 2014) (noting that when an argument

---

[3] The Syphers court pointed to two district court decisions where the government continued to do searches on seized electronic data for many months after first executing the warrant but where the courts found that such a period of time was not unreasonable. First, in United States v. Gorrell, 360 F. Supp. 2d 48, 55 n.5 (D.D.C. 2004), there was a ten-month delay in processing the seized computer and camera, but the court found that "[t]he warrant did not limit the amount of time in which the government was required to complete its off-site forensic analysis of the seized items and the courts have not imposed such a prophylactic constraint on law enforcement." And, in United States v. Triumph Capital Group, Inc., 211 F.R.D. 31, 66 (D. Conn. 2002), the court found that "computer searches are not, and cannot be subject to any rigid time limit because they may involve much more information than an ordinary document search, more preparation and a greater degree of care in their execution."

"lack[s] . . . specificity, any claim of error relating to the statements may well be waived").[4]

That leaves Aboshady's apparent contention that the flagrant violation in the execution of the warrant inheres in the government's impermissible search and seizure of the particular electronic documents that contained the very personal information that he describes the government as having acquired from Google, Inc. pursuant to Section II of the warrant but that he contends that Section III of the warrant, properly read, did not then permit the government to search or seize. Aboshady premises this argument on the contention that the reference in Section III to "identity" does not provide the government with authorization to search or seize emails that Google, Inc. had handed over just based on the fact that those emails were associated with Aboshady's email account.

---

[4] Aboshady invokes United States v. Wey, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), which held that a search of electronic data was "impermissible" because the agents searched "materials already sorted out as impertinent two years earlier" based on alternative charging theories that were "never presented to a judge," id. at 405-09. But, Wey noted that the government appeared to be "intentionally taking advantage of its sweeping electronic take to look for evidence" that "essentially" supported an "independently developed probable cause," id. at 407, and there is no basis in this record for finding similarly here.

- 12 -

There is no basis on this record, however, for concluding that the government's search or seizure of the information that Aboshady contends falls outside the warrant's scope depends on a construction of the reference to "identity" in Section III that would necessarily encompass any email in the data that the government had acquired from Google, Inc. that had been sent to or received from the email address appearing to bear Aboshady's surname. The electronic documents that he identifies as having been encompassed by the government's supposedly overbroad interpretation of the word "identity" in Section III of the warrant included statements and pictures uniquely relevant to Aboshady because they were uniquely personal to Aboshady, and only Aboshady. This feature of those documents thus demonstrated that it was unlikely that anyone but Aboshady would have sent or received the emails that contained the statements or pictures and, in that respect, as the District Court concluded, helped to demonstrate that the email account that was alleged to be Aboshady's was in his control, despite his apparent contention to the contrary. The same could not necessarily be said of every email sent or received from that address.

Moreover, the word "identity" must be given some meaning. Yet, Aboshady does not explain what meaning he would ascribe to that word that would give it some content and yet also clearly preclude the search and seizure of electronic files

that -- in consequence of the especially personal information contained in them -- provide evidence that at the time the files were sent and received, Aboshady had control over the email address to or from which the information had been sent.[5]  For this reason, too, we reject this aspect of his challenge to the denial of his motion to suppress.

In any event, even if we were persuaded by Aboshady's argument that the government's execution of the warrant misapplied Section III's reference to "identity," Aboshady is not entitled to the remedy he seeks — the blanket suppression of <u>all</u> emails seized and admitted at trial.  Under our precedent, "[t]he remedy in the

_____

[5] We note that Aboshady supports his contention that "[t]he government's execution of the Gmail warrant was unreasonable -- and unconstitutional -- because it made <u>no</u> attempt, at all, to 'segregate[e] electronic data that is seizable from that which is not,'" by quoting from <u>United States</u> v. <u>Comprehensive Drug Testing, Inc.</u>, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc) (per curiam). But, the full sentence from <u>Comprehensive Drug Testing</u> from which Aboshady partially quotes in this passage states that:  "The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect."  <u>Id.</u> Given what the record shows about the nature of the electronic documents that contain the personal information that Aboshady highlights and how the nature of that information bears on the identity of the person in control of the email address to which that information had been sent or from which that information had been received, the mere fact that the government retained that information and also may have searched it fails to demonstrate that the government made no attempt to segregate the data acquired from Google, Inc. that the warrant permitted to be searched and seized from the data that the warrant did not.

- 14 -

case of a seizure that casts its net too broadly is . . . not blanket suppression but partial suppression." United States v. Falon, 959 F.2d 1143, 1149 (1st Cir. 1992) (citing United States v. Riggs, 690 F.2d 298, 300 (1st Cir. 1982)). If the scope of the government's search was too broad, Aboshady would only be entitled to suppression of those emails that were introduced at trial and that reasonably fell outside the scope of the warrant unless the "lawful and unlawful parts of the search are inextricably intertwined or where the lawful part seems to have been a kind of pretext for the unlawful part." United States v. Young, 877 F.2d 1099, 1105 (1st Cir. 1989). Aboshady cannot show either. What is more, Aboshady has not clearly identified which emails that were introduced at trial fell outside the scope of the warrant. Consequently, even if the government's conduct violated the Fourth Amendment, there is nothing in the record to show that any of the evidence introduced at trial should have been suppressed.

## III.

Aboshady's second set of challenges focus on the District Court's instruction to the jury about the inferences that it could draw from the fact that one of the staff members of the NEPA Cairo office, Joseph Ashraf, was not called to testify. Ashraf appeared on the government's initial witness list and was referenced by multiple witnesses during the course of trial. On the eve of trial, Aboshady asked the District Court to give a so-

- 15 -

called "missing witness" instruction to inform the jury that it was permitted to infer that Ashraf's testimony would have been unfavorable to the government. See First Cir. Pattern Crim. Jury Instruction 2.12. The District Court denied this request, and Aboshady has not renewed his request on appeal.

Instead, Aboshady focuses on the instruction that the District Court ultimately gave — which instructed the jury concerning the inferences that could be drawn from the fact that a witness had not been called to testify. Here, too, we find that his challenges lack merit.

Aboshady's trial counsel, in his closing argument to the jury, asserted that there was a lack of direct evidence that a co-conspirator possessed the requisite criminal intent to be guilty of a crime and that Aboshady could not "aid and abet a non-crime." His trial counsel then added that the government had been in contact with Ashraf and "[t]he Government has this [Immigration and Customs Enforcement] parole procedure to bring people into the country, but he's not here." And, further, Aboshady's trial counsel stated in his closing argument that there are "[s]ome questions that are unanswered because there is this hole in the case" and that one of these questions was whether Ashraf and the other Cairo-based employees had the requisite intent to conspire with Aboshady.

Following these statements by trial counsel, the District Court, sua sponte, instructed the jury:

You must also not make any inferences based upon any witness who was not called to testify. There is no requirement that all participants in a crime be charged and prosecuted or tried in one proceeding or that all witnesses testify. Also, other individuals who were mentioned frequently during the trial and may have had relevant information for your consideration were not called as witnesses to testify because they were beyond the subpoena power of either party and unavailable as witnesses for either the Government or the Defendant. Therefore, you should draw no conclusions either for or against the Defendant or the Government from the failure of such witnesses to appear and testify at this trial. Your verdict must be based solely on the evidence presented in this Courtroom and in accordance with my instructions.

Aboshady then moved to strike the instruction, which he described as "about when a witness is beyond the subpoena power of both sides;" "because there was no evidence about subpoena power of either side" counsel argued, "it's inappropriate because there was no evidence." The District Court denied the motion to strike the instruction.[6]

Aboshady argues on appeal that the District Court erred in denying the motion to strike because the instruction wrongly stated that the jury could "not make any inferences based upon any

---

[6] We treat as waived for lack of development any challenge to the instruction insofar as it relates to any witness other than Ashraf. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

witness who were not called to testify." The parties dispute whether Aboshady preserved this challenge below and thus whether we review this challenge de novo or only for plain error. But, we may bypass this dispute, because the challenge fails even under the de novo standard that Aboshady contends applies. See United States v. Wright, 937 F.3d 8, 22 (1st Cir. 2019) (explaining that for "preserved challenges to jury instructions, we 'consider de novo whether an instruction embodied an error of law'" (quoting United States v. Ackell, 907 F.3d 67, 78 (1st Cir. 2018))).

We have explained before that a party may "highlight" a "missing witness[] to argue evidentiary insufficiency." United States v. Jiménez-Torres, 435 F.3d 3, 12 (1st Cir. 2006). We have further explained that "[w]here the court finds that an uncalled witness is clearly favorably disposed toward one of the parties, an instruction, if requested, may properly be given that the jury may draw an inference favorable to the other party." United States v. Johnson, 467 F.2d 804, 809 (1st Cir. 1972); see also id. at 808 ("The basis for either argumentative comments or request for instructions with regard to an opponent's failure to call a knowledgeable witness is . . . that if a party has evidence which will illuminate questions in issue and fails to present it, it may be inferred that such evidence would be harmful to his case.").

We have also explained, however, that an "[a]ttorney[] may not argue that the jury should draw an inference against an

- 18 -

opponent where the opponent does not present witnesses that are available to both parties." Jiménez-Torres, 435 F.3d at 12 (citing Johnson, 467 F.2d at 808 ("No inference is permissible, however, where . . . the evidence is equally available to either party.")). And, in Johnson, we observed that, even if a party cannot subpoena a witness or require a witness to testify, the witness could still be "available" to that party if favorably disposed to the party, such that the witness would testify of the witness's own volition were the party to so request. 467 F.2d at 808-09 ("A witness's availability is not to be decided on the basis of his physical presence in the court room or his accessibility . . . by subpoena. We hold rather that a witness's . . . availability is to be determined on the basis of his disposition and relationship toward the parties.").

Here, in denying Aboshady's request for a missing witness instruction before trial, the District Court specifically found that it was "satisfied with the government[']s explanation of Mr. Ashraf[']s unwillingness to come to the United States to testify at trial," such that "a missing witness instruction will not be given." Moreover, Aboshady develops no argument that the explanation provided to the District Court reveals that either Ashraf's reason for being unwilling to come to testify or that the government's reason for not calling him had to do with any hostility to or disagreement on his part with the government's

case against Aboshady. Nor does Aboshady dispute that neither he nor the government had the power to compel Ashraf to testify at trial, as he does not dispute that neither party had the authority to subpoena a foreign national located in a foreign country. See Fed. R. Crim. P. 17(e)(2); 28 U.S.C. § 1783; United States v. Theresius Filippi, 918 F.2d 244, 246 n.2 (1st Cir. 1990) ("The United States has no subpoena power over a foreign national in a foreign country."). Thus, because Aboshady fails to develop any argument as to how, notwithstanding these aspects of the record, he can meet the Johnson standard with respect to whether Ashraf was "available" to the government, see Jiménez-Torres, 435 F.3d at 12; Johnson, 467 F.2d at 808-809, we see no basis for finding error in the District Court's "no inference" instruction.

Insofar as Aboshady means to challenge the District Court's instruction on the separate ground that it impermissibly shifted the prosecution's burden by "improperly nullif[ing]" defense counsel's argument that the government had failed to meet its burden of proof, this argument also fails. The instruction merely told the jury not to make any inference as to why the government did not call the witness. It did not instruct the jury not to consider the lack of testimony from Ashraf and other Cairo employees in deciding whether the government had met its burden to prove Aboshady's guilt beyond a reasonable doubt on any of the charges. Moreover, "[j]ury instructions must be read as a whole,

not in some sort of splendid isolation," and the District Court separately instructed the jury that the prosecution retained the burden of proof. United States v. Goris, 876 F.3d 40, 48 (1st Cir. 2017); see Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting "the almost invariable assumption of the law that jurors follow their instructions"); United States v. Diaz-Diaz, 433 F.3d 128, 135 (1st Cir. 2005) (finding that although the prosecutors' statement to the jury impermissibly shifted the burden of proof to the defense, the remark was effectively addressed by the judge's prompt instruction "to the jury that the burden of proof remained with the government").

Finally, Aboshady challenges the instruction because he contends that it added a fact not in evidence by stating that certain witnesses did not testify "because" they were beyond the parties' subpoena power. A federal district court judge can "comment on the facts and evidence," but if, in doing so, a judge adds a fact not in evidence, then the judge has "exceed[ed] the limitations on his power to comment." United States v. Paiva, 892 F.2d 148, 159 (1st Cir. 1989). The question then becomes whether any such error was nonetheless harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967); see also Paiva, 892 F.2d at 159.

Aboshady contends that, by instructing the jury that the witnesses had not testified "because they were beyond the subpoena

- 21 -

power of either party and unavailable as witnesses," (emphasis added), the District Court necessarily implied that Ashraf would not appear as a witness at the trial of his own volition even though no evidence had been introduced to support that determination. But, even assuming that construction of the instruction is a tenable one, any error was harmless beyond a reasonable doubt on this record.

Aboshady's assertion that the instruction was not harmless depends on his contention that the wording of the instruction effectively precluded the jury from drawing the inference from Ashraf's nonappearance that he would have testified in Aboshady's favor. But, as we have explained, Aboshady has failed to make the case that the District Court, on this record, erred in instructing the jury not to draw that precise inference. Accordingly, we do not see how the instruction may be understood to have caused Aboshady any harm. See Paiva, 892 F.2d at 159.

## IV.

For the reasons stated, we **affirm** Aboshady's conviction.