# United States Court of Appeals

## For the First Circuit

No. 20-1846

CINDY CURTIS; DEMETRE CAMBOURIS,

Plaintiffs, Appellants,

v.

NICHOLAS GALAKATOS, as owner of the M/V GALANI,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Thompson and Lipez, Circuit Judges,
and Torresen,[*] District Judge.

Thomas P. Giuffra, with whom Brian Keane, Keane Law Group, P.C., Jeremy Hellman, and Rheingold Giuffra Ruffo & Plotkin LLP were on brief, for appellants.
Bruce G. Paulsen, with whom David J. Farrell, Jr., David S. Smith, Farrell Smith O'Connell Aarsheim Aprans LLP, Brian P. Maloney, and Seward & Kissel LLP were on brief, for appellee.

November 29, 2021

---

[*] Of the District of Maine, sitting by designation.

**THOMPSON**, **Circuit Judge**.   On vacation in Greece, two U.S. citizens, Cindy Curtis and Demetre Cambouris, were ferrying along on a small boat, the M/V Marina.  That is until another boat, the M/V Galani, smacked into the Marina and sunk it in the Paros-Antiparos Strait.  On top of the marine wreckage, the crash also left Curtis with serious personal injuries.  So she and her husband sued the U.S.-citizen owner of the Galani, Nicholas Galakatos, in federal court in Massachusetts seeking damages.  Galakatos, though, told the district court that this was a suit meant for Greece--not the United States--and moved to dismiss on the ground of forum non conveniens.  The district court agreed and sent the parties packing for a Greek court.  Ever mindful of our deferential standard of review in this context, we nonetheless reverse.

## THE FACTS

Curtis and Cambouris, spouses, hail from New York.  In the summer of 2018, they crossed the pond to spend time in Greece, specifically in the area of the Paros-Antiparos Strait.  While there, they (along with one other passenger) took a ride aboard Cambouris's boat, the M/V Marina, in the Strait.

That same day, Galakatos's M/V Galani, piloted by Greek citizen Dimitrios Faroupos, was also traveling the Strait.  Faroupos (who we now know is the gardener at Galakatos's summer residence in Greece) was carrying six others on board the Galani

at the time. When the collision occurred, Galakatos was back home in Massachusetts.

With Faroupos at the helm, the Galani plowed into the stern (i.e., the back) of the Marina, traversing its way over the passenger area before plunging back into the water on the other side. In the process, the Galani's hull and propellers struck Curtis. Nearby vessels rescued all three passengers. The Marina, though, sunk, its wreckage ultimately towed out of the Strait.

After being pulled from the water, Curtis was brought to the local medical center and shortly thereafter transferred to a hospital in Athens. Physicians there diagnosed a host of serious injuries, including: ten broken ribs, eight of which were fractured front and back; fractures of her shoulder blade, collarbone, sternum, and lower arm; multiple fractures in her leg; and massive wounds on her thigh from the propeller blades. Various surgical procedures kept her in the Intensive Care Unit for about a month. After being hospitalized a bit longer in Athens, she made her way home to the United States, where she was admitted to New York Presbyterian Hospital in New York City. There, she underwent even more surgical procedures. Curtis has since gone through months of physical therapy. And more than a year after the shipwreck, Curtis still required a walker to balance.

Following the crash, the Paros Port Authority investigated. In that investigation, sworn depositions or

declarations have been provided in Greek by thirteen individuals. The case was then assigned to the Public Prosecutor by the First Instance Court of Syros to decide whether to prosecute anyone in the matter. At some point after the crash, Faroupos was arrested for provocation of a shipwreck and causing serious personal injury. He was later released. The criminal case is still ongoing.

About six months after the crash, Curtis and Cambouris filed suit against Galakatos in the United States. Rather than sue back in their Empire State, Curtis and Cambouris shipped up to Boston and filed suit in the federal court of Galakatos's hometown. They brought claims for maritime negligence, loss of consortium, and property damage.

Galakatos moved to dismiss the complaint for forum non conveniens, arguing that Greece, not Massachusetts, is the "most appropriate venue" for this case. In support of the motion, Galakatos submitted his own affidavit. In it, he declared that he was not in Greece at the time of the accident and felt it was important to proceed in Greece because "nearly all of the identifiable witnesses to this incident other than the Plaintiffs reside in Greece." Thus, he reasoned, trying this case in Massachusetts "would be damaging and prejudicial to [his] ability to defend the action." He also submitted an affidavit of a Greek attorney, who gave his opinion on a smattering of Greek-law issues. Importantly, the attorney also provided a list of names of the

thirteen individuals who gave depositions or declarations to the Port Authority, which he obtained from Faroupos's attorney. Given these facts, Galakatos agreed to submit to the jurisdiction of an appropriate Greek court and to waive any statute-of-limitations defense.

Persuaded, the district court dismissed the case, and Curtis and Cambouris now appeal. But before we dig into the issue raised here, we first get our bearings with the multifaceted law of forum non conveniens.

**THE LAW TO APPLY**

Forum non conveniens gives courts the discretion "to dismiss a case because the chosen forum (despite the presence of jurisdiction and venue) is so inconvenient that it would be unfair to conduct the litigation in that place." Nandjou v. Marriott Int'l, Inc., 985 F.3d 135, 140 (1st Cir. 2021) (quoting Howe v. Goldcorp Invs., Ltd., 946 F.2d 944, 947 (1st Cir. 1991)).[1] Dismissal on that doctrinal basis "reflects a court's assessment of a 'range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality.'" Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 429 (2007)

---

[1] For those who aren't fluent in Latin, forum non conveniens translates to "an unsuitable court." Forum Non Conveniens, Black's Law Dictionary (11th ed. 2019).

- 5 -

(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 723 (1996)). When a district court makes a forum non conveniens dismissal, the "practical effect" is that the plaintiffs have to re-file in a more convenient court, Nandjou, 985 F.3d at 140, perhaps a foreign one, see Sinochem Int'l, 549 U.S. at 430 (noting that common-law forum non conveniens applies when the alternative forum is abroad).[2]

Forum non conveniens is a balancing act. On the one hand, a plaintiff ordinarily holds a "heavy presumption weigh[ing] in favor of [her] initial forum choice." Adelson v. Hananel, 510 F.3d 43, 53 (1st Cir. 2007). Her forum choice "will be disturbed only rarely." Nowak v. Tak How Invs., 94 F.3d 708, 719 (1st Cir. 1996). Still, it is not as though the plaintiff's choice of forum is "given dispositive weight" such that "dismissal [is] automatically barred when a plaintiff has filed suit in [her] home forum." Interface Partners Int'l, Ltd. v. Hananel, 575 F.3d 97, 102 (1st Cir. 2009) (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.23 (1981)); see also Nandjou, 985 F.3d at 142 (noting that a U.S. forum is a "home forum" even when the plaintiff is from another state where the alternative is a non-U.S. court). It just means that there's a "heavy burden" on a defendant to show

---

[2] If the more convenient forum is another U.S. federal court, we'd be looking not to common-law forum non conveniens, but the statutorily codified version of the doctrine. See 28 U.S.C. § 1404(a); Sinochem Int'l, 549 U.S. at 430.

why the balance favors vetoing the plaintiff's forum choice. Nandjou, 985 F.3d at 141 (quoting Adelson, 510 F.3d at 52).

To meet that heavy burden, a defendant must show, on the other side of the scale, that the plaintiff's chosen forum is "so inconvenient that transfer is needed to avoid serious unfairness." See id. (emphasis in original) (quoting Adelson, 510 F.3d at 52). Indeed, we recognize that a plaintiff's forum choice may "'vex, harass, or oppress the defendant by inflicting upon [her] expense' or unnecessary trouble." Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)). Yet "a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown." Id. (quoting Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)). To overcome that presumption, the oppressiveness and vexation must be "out of all proportion to plaintiff's convenience," or the administrative and legal problems too much for the court to bear. Am. Dredging Co. v. Miller, 510 U.S. 443, 447-48 (1994) (quoting Piper, 454 U.S. at 241).

Meeting that heavy burden involves two steps. First, the defendant has a burden to show that an "adequate alternative forum exists." Shinya Imamura v. Gen. Elec. Co., 957 F.3d 98, 106 (1st Cir. 2020). "[A]n adequate alternative forum exists when '(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated

- 7 -

unfairly, even though they may not enjoy the same benefits as they might receive in an American court.'" Id. (quoting Mercier v. Sheraton Int'l, Inc. (Mercier I), 935 F.2d 419, 424 (1st Cir. 1991)). If the defendant fails to show there's another suitable court to hear the plaintiff's case, that's the end of the line for her forum non conveniens motion. See Nandjou, 985 F.3d at 141.

Second, if there's an adequate alternative forum, the defendant must also show that a balance of public and private interest factors "strongly favor litigating the claim in the second forum." Nandjou, 985 F.3d at 142 (citation omitted) (emphasis in original). If, on balance, the interest factors are about equal, that's not enough to surmount the defendant's heavy burden. See id. at 141.

As for the public interest factors that get thrown onto the scale, the Supreme Court has taught us this: we are to consider

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Piper, 454 U.S. at 241 n.6 (quoting Gulf Oil, 330 U.S. at 509).

The private interest factors require consideration of the practicalities of litigating a case in a particular forum that

may make it easy and inexpensive, or cumbersome and extra costly. See Iragorri v. Int'l Elevator, Inc., 203 F.3d 8, 12 (1st Cir. 2000). These factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [and the] possibility of view of premises, if view would be appropriate to the action." Id. (alteration in original) (quoting Gulf Oil, 330 U.S. at 508). As particularly relevant here, courts must consider "the nature of the plaintiff's claims and the evidence that would be relied upon to adjudicate them." Nandjou, 985 F.3d at 142. In doing so, courts ought to give "particular attention to where the witnesses that the parties would rely upon are located" and "how burdensome it would be for them to appear in either the home or the foreign forum." Id. Additionally, courts must give "due consideration . . . to how many . . . witnesses are third parties to the litigation and whether, despite their third-party status, they would be subject to compulsory process in either the home or the foreign forum." Id.

This list of public and private interest factors, though, isn't exhaustive. They're merely a "helpful starting point." Imamura, 957 F.3d at 107 (quoting Iragorri, 203 F.3d at 12); see, e.g., Nandjou, 989 F.3d at 146 (considering the physical and emotional toll to witnesses on returning to a location where

they experienced a traumatic experience); Nowak, 94 F.3d at 719 (considering as a private interest factor the ability of a plaintiff to use a contingent-fee arrangement). Indeed, "flexibility is the watchword" with forum non conveniens cases, Iragorri, 203 F.3d at 12, as the inquiry ultimately turns on the unique facts of each case, Piper, 454 U.S. at 249. The "ultimate inquiry" remains, all in all, "where trial will best serve the convenience of the parties and the ends of justice." Imamura, 957 F.3d at 107 (quoting Koster, 330 U.S. at 527).

Given this multifaceted and fact-laden inquiry, our review of a district court's forum non conveniens conclusion is (as the Supreme Court has put it) only for a "clear abuse of discretion," Piper, 454 U.S. at 257, which we've since interpreted to be the same test as abuse-of-discretion review, see, e.g., Imamura, 957 F.3d at 106 (calling it "abuse of discretion" and citing Piper); Mercier I, 935 F.2d at 423 (same). As we've said in other contexts, though, the abuse-of-discretion standard isn't a rubber stamp. Colón-Cabrera v. Esso Std. Oil Co. P.R., 723 F.3d 82, 88 (1st Cir. 2013); accord Simon v. Republic of Hungary, 911 F.3d 1172, 1190 (D.C. Cir. 2018) ("While we accord respectful deference to district courts' forum non conveniens determinations, we do not rubber stamp them."). An abuse of discretion in deciding a forum non conveniens motion occurs when a district court has "(1) failed to consider a material factor; (2) substantially relied

on an improper factor; or (3) assessed the proper factors, but clearly erred in weighing them." Nandjou, 985 F.3d at 142 (quoting Interface Partners, 575 F.3d at 101).

## OUR TAKE

With that framework in mind, we dive into our analysis. Curtis and Cambouris say the district court abused its discretion in concluding "the overall balance" "strongly favors Greece as the more convenient and efficient forum." Although they now concede Greece is an adequate alternative forum, they stress that the district court erred in determining that the public and private interest factors strongly favor litigating in Greece. As we'll explain in some detail, we agree that the district court erred in considering the private interest factors and clearly erred in striking the overall balance, thus abusing its discretion.

### A. The Public Interest Factors

We begin, though, with the public interest factors, as to which we find no error in the district court's determination that they weighed in favor of litigating in Greece. The court recognized the United States' interest in adjudicating the controversy between three U.S. citizens but determined that interest was outweighed by the fact that, in totality, the United States' connection to the events, even if Galakatos resides in

- 11 -

Massachusetts, was "attenuated."[3]  The court emphasized that the collision occurred in Greece and presumably "much of the relevant evidence is located there."  "Provided adequate recognition is accorded 'the substantial public interest in providing a convenient United States forum for an action in which all parties are United States citizens and residents,' the trial court may weigh, as a subsidiary consideration, any attenuated connection between the particular United States forum and the matter in litigation."  Mercier v. Sheraton Int'l, Inc. (Mercier II), 981 F.2d 1345, 1355 (1st Cir. 1992) (quoting Mercier I, 935 F.2d at 430).  It was not error to find that the particular contacts with Massachusetts were limited and to balance that consideration against the United States' general interest in deciding disputes between its citizens.  See id.[4]

Nor did the court err when in its analysis it placed weight towards dismissal on its unfamiliarity with Greek law.  See

---

[3] We note that Curtis and Cambouris filed suit in Massachusetts, Galakatos's home state, rather than their home state of New York.  But since the alternative forum was a non-U.S. court, Massachusetts still counted as the plaintiffs' "home forum"--even though they are New York residents.  See Nandjou, 985 F.3d at 142.

[4] Our recent decision in Nandjou is not to the contrary. There, we affirmed that the district court didn't err in concluding that Massachusetts's interest in the dispute was a "neutral" factor where a Massachusetts citizen sued not only a U.S.-citizen defendant, but also a Canadian-citizen defendant, for an accident that occurred in Canada.  See 985 F.3d at 143.  But it is not error for the district court here to come out the other way.

- 12 -

Mercier I, 981 F.2d at 1357 (noting courts may ascribe some weight to the unfamiliarity with foreign law, but cautioning that they not give it "undue importance" since "the task of deciding foreign law is a chore courts must often perform" (cleaned up) (quoting Manu Int'l, S.A. v. Avon Prods., Inc., 641 F.2d 62, 68 (2d Cir. 1981))).[5]  Though we note that, in the grand scheme of things, the court said this factor weighed only "somewhat" toward dismissal.

## B.  The Private Interest Factors

When it came to the private interest factors, the court thought those weighed in favor of sending this case to Greece. The court emphasized that the accident occurring in Greece weighed heavily in favor of Greece, and that the Greek authorities had investigated--examining physical evidence and taking sworn testimony from witnesses.  The court concluded that "the vast majority of key fact witnesses, including eyewitnesses to the collision, Ms. Curtis'[s] Greek treating physicians, and the pilot of the Galani, all reside in Greece."  And, because "only a Greek court has the power to compel the testimony of Greek witnesses,"

---

[5] We also note that we reject Galakatos's argument that the court, under the public interest factors, should consider the "burden of requiring a Massachusetts jury to interpret and analyze issues of Greek law."  Courts--not finders of fact--interpret and analyze issues of law.  See Fed. R. Civ. P. 44.1 (noting the court's determination of foreign law is treated as a question of law); Animal Sci. Prods. v. Hebei Welcome Pharm. Co., 138 S. Ct. 1865, 1873 (2018).  Juries determine the facts and apply them to the law the court provides.

- 13 -

the court thought this weighed toward litigating in Greece.[6]  But according to Curtis and Cambouris, Galakatos, contrary to what the district court found, failed to meet his burden of showing that the witnesses were both unavailable to testify in the United States and relevant to this case.  In consequence, they say, by failing to hold Galakatos to his burden, the district court committed legal error.

Galakatos, for his part, says that he has no burden to provide detailed information on the identity of witnesses or their relevance to the case.  Regardless, he presses there is evidence that there were statements from twelve non-U.S. citizens given to the Greek Port Authority in the initial investigation and that fact suffices.[7]  Thus, whatever may be his burden has been met.

In our view, the problem with Galakatos's argument is that the district court had insufficient evidence to support the purported residency of these twelve individuals as we'll discuss in more detail momentarily.[8]  As for Galakatos's claim that he has

---

[6] This is so because parties lack the "authority to subpoena a foreign national located in a foreign country." United States v. Aboshady, 951 F.3d 1, 11 (1st Cir. 2020) (citing Fed. R. Crim. P. 17(e)(2)); see Fed. R. Civ. P. 45(b)(3) (providing, just as Fed. R. Crim. P. 17(e)(2), that 28 U.S.C. § 1783 governs service of subpoenas in a foreign country); see also 28 U.S.C. § 1783(a) (providing for service in a foreign country only if the witness is a U.S. national or resident).

[7] One of the thirteen statements was from Galakatos, and we know he's a U.S. citizen.

[8] Galakatos claims that the plaintiffs didn't raise any issue with the sufficiency of the evidence on the witnesses' nationality

no obligation to produce any detailed evidence regarding witnesses, we think Galakatos may be oversimplifying our case law.

True, we've said before, "there is no 'blanket rule' that a defendant affirmatively demonstrate, by affidavit, the unavailability of a foreign witness and the significance of the witness's testimony." Interface Partners, 575 F.3d at 104 (quoting Mercier II, 981 F.2d at 1356). Indeed, the Supreme Court has specifically rejected the contention that defendants seeking forum non conveniens dismissal must submit detailed "affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum." Piper, 454 U.S. at 258. "Such detail," the Court said, "is not necessary." Id.

On the other hand, though, the Piper Court made clear that "[o]f course, defendants must provide enough information to enable the District Court to balance the parties' interests." Id. (emphasis added). Yet the Court didn't provide much guidance on what constitutes "enough"--although it found the defendants did present "enough" in Piper. Id.; see Otto Candies, LLC v. Citigroup, Inc., 963 F.3d 1331, 1347 (11th Cir. 2020) (noting the lack of clear guidance from Piper on what is "enough").

---

below, and thus waived it. But the record makes plain that Curtis and Cambouris did object to Galakatos's lack of evidence on the unavailability of witnesses--just apparently not with as much specificity as Galakatos desires.

So, delving into what the Piper Court deemed sufficient will be instructive in gleaning a benchmark for what meets the defendant's evidentiary burden. But before we take a look at the evidence the Piper defendants offered, some context of the case will prove helpful.

Piper involved a dispute over a tragic airplane crash. The airplane, manufactured by U.S.-based Piper Aircraft Co., was on a flight from Blackpool, England to Perth, Scotland when it crashed in the Scottish Highlands after a potential failure with the propeller, manufactured by U.S.-based Hartzell Propeller, Inc. Piper, 454 U.S. at 238-39. All five passengers--who were all residents of Scotland--died in the crash. Id. The plane at the time was owned, maintained, and operated by United Kingdom-based entities. Id. A U.S. resident, Gaynell Reyno, brought suit in a U.S. court as the court-appointed administratrix of the estates of the five Scottish passengers (whom she wasn't in any way related to). Id. Asserting wrongful-death and strict-liability claims against the two U.S.-based manufacturers, Reyno admitted that she filed suit in the U.S. because the applicable laws and available relief were much more favorable than those in Scotland. Id. at 239-40.

The U.S.-based defendants moved to dismiss for forum non conveniens. Id. at 240-41. They argued, as relevant to us, that key witnesses on liability and damages--specifically those who

could testify about the aircraft's maintenance since manufacture, the training of the pilot, and the investigation of the accident-- were based in the U.K.  Id. at 242.  The district court agreed, but the Third Circuit reversed.  Id. at 243-44.  The Third Circuit concluded that the defendants hadn't met their burden on witness inconvenience because they did not specify the witnesses they would call and the testimony the witnesses would provide.  Id. at 244.

The Supreme Court, as we've already hinted, disagreed. Rejecting the Third Circuit's witness-convenience conclusion, the Court indicated that "[s]uch detail is not necessary."  Id. at 258.  Still, as we've noted, the Court made clear that defendants "[o]f course . . . must provide enough information to enable the District Court to balance the parties' interests," which the defendants did there.  Id.

In finding that the defendants submitted "enough," the high Court referred to the affidavits submitted by the defendants, particularly the one submitted by Piper Aircraft Co.  See id. at 258-59 & n.27.  In it, Piper Aircraft identified, with some detail, the individuals it would call as witnesses in a trial.  See Aff. of Charles J. McKelvey, Pet. for Writ of Cert. of Piper Aircraft Co. at 1f–3f, Piper, 454 U.S. 235 (1981) (No. 80-848).  Although it did not identify individuals by name, Piper Aircraft identified general groups of people (e.g., individuals from the Scottish company that owned and operated the aircraft, and individuals from

the aircraft maintenance company) and the general topic of their testimony. And it submitted that all of these individuals were residents of Scotland--a fact that the plaintiff never disputed. See Reyno v. Piper Aircraft Co., 479 F. Supp. 727, 732 (M.D. Pa. 1979) (noting that "[e]ven Plaintiff admits that all witnesses to damages reside in Scotland" and rejecting her argument "that the evidence going to legitimately raised defenses is irrelevant"). Rather, because she brought a claim only for strict liability, the plaintiff in Piper thought the only relevant witnesses were the U.S.-based manufacturer's employees. See Opp'ns to Pets. for Writs of Cert., Piper, 454 U.S. 236 (1981) (No. 80-848), 1980 U.S. S. Ct. Briefs LEXIS 1793, at *9-10. But the manufacturer pressed as a defense that events in Scotland in the seven years since the aircraft's assembly could have affected the manufacturer's liability. See Tr. Oral Arg. at 18-19, Piper, 454 U.S. 236 (1981) (No. 80-848). And, in furtherance of its request to move the venue, the manufacturer expressly agreed to bear the burden of transporting those U.S.-based witnesses to Scotland. See id. at 18.

The evidentiary support Galakatos offered up here is a far cry from that in Piper. First, it was undisputed in Piper that all the witnesses the defendant sought to call--save those U.S.-based-employee witnesses who would travel to Scotland at the defendant's expense--were located in Scotland. The Piper Court

- 18 -

thus could make the reasonable assumption that a Scottish court could compel those witnesses to testify. Here, Curtis and Cambouris have made no similar concession as to the residency of the witnesses Galakatos has identified. And, though we've scoured the record, we've found but one piece of evidence from Galakatos on this subject: Galakatos's statement that "nearly all of the identifiable witnesses to this incident other than the Plaintiffs reside in Greece." Further, all we have to explain that allegation is his counsel's "understanding" (again without any factual basis) that the eleven individuals with seemingly Greek surnames are citizens of Greece and not, as Cambouris was, merely vacationers.[9] See Duha v. Agrium, Inc., 448 F.3d 867, 879 (6th Cir. 2006) (holding the district court abused its discretion in giving undue weight to information about witnesses "asserted in [the defendant's] brief but not by affidavit or in any other record evidence"). Without such evidence identifying the witnesses' residency,[10] the district court did not have a sufficient basis to

_____

[9] Galakatos argues we can infer these individuals are Greek residents because the Port Authority report specifies that Curtis is of "USA Nationality," but doesn't say the same for others. It's not clear how the Port Authority decided to mark (or not mark) various nationalities in the report. However, as Curtis and Cambouris point out, the lack of similar notations of nationality for other individuals appears to be based off assumptions about last names. Cambouris (a U.S. citizen and resident of New York) doesn't have a "USA Nationality" notation after his name.

[10] Of course, it could be necessary to know not just the witnesses' residency but also their citizenship, as the district court could (so long as other requirements are met) have the

conclude that a Greek court could compel testimony from these eleven individuals.[11]   See, e.g., SAS Inst., Inc. v. World Programming Ltd., 468 F. App'x 264, 266-67 (4th Cir. 2012) (per curiam) (finding abuse of discretion because the district court failed to hold the defendant to its burden by relying on a barebones affidavit stating that witnesses were in the U.K.).  Its finding to the contrary was clear error, and its resulting emphasis on this factor was erroneous.

Further, putting aside the residency of the witnesses, the district court again erred when it placed undue weight on a Greek court's ability, if any, to compel witness testimony.  As the Supreme Court has instructed, courts consider the "availability of compulsory process for attendance of unwilling

_____

authority to compel the testimony of a U.S. citizen residing abroad.  See 28 U.S.C. § 1783 (providing for service of a subpoena on a U.S. citizen on international soil if certain findings are made by the district court); see also Fed. R. Civ. P. 45(b)(3). Though residency of a non-U.S. citizen, too, would be relevant to the question of whether witnesses' testimony could be compelled, since a district court could have the authority to compel the testimony of a Greek citizen residing in the United States.  See Fed. R. Civ. P. 45(b)(2); Probulk Carriers Ltd. v. Marvel Int'l Mgmt. & Transp., 180 F. Supp. 3d 290, 292 (S.D.N.Y. 2016) (concluding subpoena on foreign national temporarily in the United States enforceable and noting that Fed. R. Civ. P. 45(b)(2) "does not distinguish between witnesses who are citizens or residents of the United States and witnesses who are not").
    [11] Galakatos has provided no legal authority suggesting that a Greek court could compel the testimony of non-resident Greek citizens.

- 20 -

. . . witnesses." Gulf Oil, 330 U.S. at 508 (emphasis added).[12] Yet Galakatos made no allegations that any of the witnesses would be unwilling to testify in the United States absent compulsory process--only (on appeal, without record support) that the witnesses are "unlikely to travel to Massachusetts to testify."[13] See Mercier I, 935 F.3d at 428 (noting the defendant "failed to establish that these witnesses would be unwilling to come to the United States"). Unlikely and unwilling do not equate, and the district court placed undue weight on the availability of compulsory process. See, e.g., Hefferan v. Ethicon Endo-Surgery Inc., 828 F.3d 488, 499 (6th Cir. 2016) (the availability of compulsory process, though a consideration, "receives less weight 'when it has not been alleged or shown that any witness would be unwilling to testify'" (quoting Duha, 448 F.3d at 877)); DiFederico v. Marriott Int'l, Inc., 714 F.3d 796, 807 (4th Cir. 2013) (noting a defendant "must do more than simply point to categories of witnesses who are outside the court's control" and that "a generalized assertion that the court cannot compel Pakistani witnesses to give testimony" doesn't establish unwillingness); cf.

---

[12] Galakatos did not argue that the "cost of obtaining attendance of willing[] witnesses," see Gulf Oil, 330 U.S. at 508 (emphasis added), weighed in favor of litigating in Greece.

[13] Indeed, he did not even make any allegation that Faroupos (the pilot of the Galani and gardener at his vacation home) would be unwilling--even though the Greek attorney submitting an affidavit on Galakatos's behalf was in contact with Faroupos's attorney.

also <u>Iragorri</u>, 203 F.3d at 17 (noting that a "mere suggestion of greater financial strain is meaningless unless and until the plaintiff demonstrates the nature and extent of the supposed limitations").[14]

Moreover, even assuming the witnesses were outside the reach of necessary Massachusetts compulsory process, Galakatos also failed to demonstrate why the proposed witnesses had any relevance to his case. Looking back to <u>Piper</u>'s baseline standard, we see that the <u>Piper</u> defendant submitted "enough" when it listed different categories of witnesses and, equally important, the subjects upon which they were proposed to testify. Further to explaining what's "enough," we have also recently clarified that a defendant's long list of potential witnesses, without more, is not always "enough" to meet its burden on the witnesses factor. See <u>Nandjou</u>, 985 F.3d at 147. In <u>Nandjou</u>, we faced another tragic case where a father and son drowned in a hotel pool in Montréal. <u>Id.</u> at 138. The defendants, as part of their <u>forum non conveniens</u>

_____

[14] Our circuit's case law hasn't always been crystal clear on this requirement. After noting in <u>Mercier I</u> that the defendant didn't establish any witness's unwillingness to come to the United States, we said subsequently in <u>Mercier II</u> that a defendant need not, in every case, establish with record evidence that unwillingness. See 981 F.3d at 1356; <u>see also</u> <u>Interface Partners</u>, 575 F.3d at 104-05 (quoting <u>Mercier II</u> for this proposition). But, as we'll soon note, the necessary information to surmount a defendant's burden will vary from case to case. And, as we'll also soon explain, the concerns driving <u>Mercier II</u>'s observation aren't present here.

motion, contended there were twenty-five witnesses in Canada (including civilian first responders, police officers, paramedics, medical personnel, and the coroner) that could not be compelled to testify in a Massachusetts court. Id. at 144-45. The plaintiffs countered by identifying three U.S.-based third-party liability witnesses, multiple U.S.-based third-party damages witnesses, and two U.S.-based party witnesses--who also happened to be the only individuals who actually witnessed the drowning at issue. Id. at 145-46. On that record, we said the district court placed undue weight on the defendants' numeric list because the defendants "[did] not explain[] why live testimony from all of those witnesses [was] critical." Id. at 147. Indeed, we said so even where the defendants offered as evidence reports from many of their list of twenty-five witnesses, including six of the civilian first responders, six police officers, and the coroner. Defs.' Renewed Mot. to Dismiss, Ex. B, at 6-16, 34-44, Nandjou v. Marriott Int'l, Inc., No. 18-CV-12230-ADB, 2019 WL 5551438 (D. Mass. Oct. 28, 2019), ECF No. 39; id., Ex. C, at 1-9.

Here, though, Galakatos submitted a list of names omitting any even generalized detail on their role in the underlying incident (whether eyewitness to the crash, first responder, or participant in the investigation).[15] Yet he bore the

_____

[15] The record contains a translated copy of the Port Authority's report on the incident, which happens to identify the

- 23 -

burden of giving the district court "enough" to evaluate the relative burdens related to the convenience of witnesses. See Van Cauwenberghe v. Biard, 486 U.S. 517, 528 (1988) (noting that to evaluate the access-to-evidence factor, the court must "evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action"). The district court erred in failing to require some showing from Galakatos as to how the witnesses were relevant. See, e.g., Nandjou, 985 F.3d at 147; Bos. Telecomms. Grp., Inc. v. Wood, 588 F.3d 1201, 1210 (9th Cir. 2009) (finding abuse of discretion in weighing witnesses factor where the defendant "provided very little information that would have enabled the district court to understand why various witnesses were material to his defense"); cf. Iragorri, 203 F.3d at 17 (emphasizing that "live testimony of key witnesses" can be essential if the defendant shows how those witnesses are critical (cleaned up) (quoting Howe, 946 F.2d at 952)).

---

role that some of these potential witnesses played on the day of the crash. (Though we note as an aside that, further to Galakatos's apparent strategy of providing little-to-no information, it wasn't Galakatos that provided this document--it was Curtis and Cambouris.) But Galakatos still did not give the district court enough information to determine that any of the witnesses actually had relevant testimony to offer.

Contrary to Galakatos's suggestion, our requirement for more information (about residency, unwillingness, or relevance) would not, on the facts of this case, "defeat the purpose of the[] motion" by requiring "extensive investigation." Piper, 454 U.S. at 258. The Piper Court was obviously concerned with forcing defendants to bear an impossible burden by identifying the names and testimony of witnesses in a jurisdiction in which they have no power to compel information. See id. (noting that defendants "have moved for dismissal precisely because many crucial witnesses are located beyond the reach of compulsory process, and thus are difficult to identify or interview"); see also Mercier II, 981 F.2d at 1356 (noting that a "blanket rule 'would tend to inflict an impossible burden'" because defendants "cannot compel evidence, including the evidence necessary to argue for dismissal" (citation omitted)). But here, Galakatos had easy access to--at the very least--the location of at least six of the eleven individuals identified on the list. As the Port Authority's investigation report makes clear, five of those individuals were aboard the Galani with Faroupos (the sixth) when the accident occurred. And although Galakatos stresses in his appellate papers that he is "not in regular communication with the eyewitnesses," it is clear Galakatos has at least some access to Faroupos: the Greek attorney hired by Galakatos's counsel obtained the list of witnesses directly from Faroupos's attorney in the criminal investigation.

Content to rest on what he believed the bare minimum, Galakatos apparently made no attempt to utilize the information he <u>could</u> access to try to shoulder his heavy burden.

Thus, although we today reaffirm that there is no "blanket rule" that a defendant identify the substance of a proposed witness's testimony, see <u>Interface Partners</u>, 575 F.3d at 104, we echo, too, the Supreme Court admonition that a defendant must give the district court enough information to analyze whether the defendant has shouldered her heavy burden, see <u>Piper</u>, 454 U.S. at 258; <u>see also</u> <u>Iragorri</u>, 203 F.3d at 17 (making clear that a "mere suggestion" of burden without evidentiary support showing the "nature and extent of the supposed limitations" may be insufficient). Again, "flexibility is the watchword," <u>Iragorri</u>, 203 F.3d at 12, and a defendant may, in some cases, need to show why the inability to compel certain non-U.S.-based witnesses strongly outweighs the plaintiff's desire to try her case in her home forum of choosing, see <u>Lacey</u> v. <u>Cessna Aircraft Co.</u>, 862 F.2d 38, 44 (3d Cir. 1988) ("[T]here is no hard and fast rule, and . . . the amount of information that a defendant must provide depends upon the facts of the particular case."); <u>In re Air Crash Disaster near New Orleans</u>, 821 F.2d 1147, 1165 n.28 (5th Cir. 1987) (en banc) (noting the detail required will vary depending on the issues that are contested), <u>vacated and remanded on other grounds sub. nom.</u> <u>Pan Am. World Airways, Inc.</u> v. <u>Lopez</u>, 490 U.S. 1032, 1033

(1989), op. reinstated in relevant part, 883 F.2d 17, 17 (5th Cir. 1989).  But a mere reliance upon assumptions--Galakatos assumes those deposed by Greek officials are in Greece and that all of them have something relevant to offer--will not do.  See Adelson, 510 F.3d at 53; Mercier I, 935 F.2d at 426 ("the district court mistakenly relieved the moving defendant of its burden" in "assuming").  All that said, defendants who choose to try to meet their heavy burden with the bare minimum of what's "enough" do so at their own peril.

We also believe the district court gave inadequate consideration to the convenience of the plaintiffs' witnesses, in particular, the plaintiff herself.[16]  The district court failed to take heed of the physical and emotional burden on Curtis in returning to Greece, as the plaintiffs requested it do.  See Nandjou, 985 F.3d at 146 (noting the district court should have considered the burden on the plaintiffs who, "if forced to testify

---

[16] Curtis and Cambouris also argue that the district court erred when it concluded that Curtis's U.S.-based medical providers' unwillingness to travel to Greece did not weigh against dismissal.  We spy no error, though, because the district court did consider this fact.  It just didn't apply the weight Curtis and Cambouris would like.  Cf. Imamura, 957 F.3d at 106 (reminding that we won't strike the balance of relevant factors anew).  And, as the district court noted, not only could Curtis and Cambouris obtain testimony from one of the treating Greek physicians (one of whom is identified by name and hospital in the record), her U.S.-based physicians could also submit written testimony.  True, U.S. courts prefer live testimony.  See Interface Partners, 575 F.3d at 105.  But Greek courts apparently generally rely on written testimony--a point Curtis doesn't dispute.

in Montreal, would be required to return to the country of their loved ones' deaths" (citing <u>Guidi</u> v. <u>Inter-Cont'l Hotels Corp.</u>, 224 F.3d 142, 145 (2d Cir. 2000))); <u>see also</u> <u>Guidi</u>, 224 F.3d at 145 (reversing a <u>forum non conveniens</u> dismissal in part because the district court failed to consider the "emotional burden" it would impose on the plaintiffs to return to Egypt, where their loved ones were killed).

Galakatos claims any physical or emotional burden on Curtis (or her husband for that matter) doesn't need much consideration because, he claims, Greek courts "rel[y] heavily on written evidence and only rarely require[] live testimony, so the likelihood of Plaintiffs being required to travel back to Greece is very small." Yet the key words in there--even assuming their accuracy--are "rarely" and "very small" likelihood. Indeed, although Galakatos avers that "testimony by a litigant party is not permitted under Greek law," his Greek attorney's testimony on that point is inconsistent. Although the attorney states that "litigant parties are not entitled to swear affidavits or be examined as witnesses," he also states (emphases our own) that there could be the "<u>rare</u> event that the Court would ask the Plaintiffs . . . to appear before it in order to be examined," and that it would be "<u>very unlikely</u> for the Court to ask from any of the Plaintiffs to travel to Greece in order to be examined." The district court didn't make any legal conclusion on whether Curtis

could be called to testify in Greece and did not consider at all how this balanced against the location of the other witnesses. It should have considered the prejudice to Curtis of possibly--even if unlikely--having to return to Greece to prosecute her claims. Cf., e.g., Mercier I, 935 F.2d at 428 (no weight given to witnesses factor where the burdens between the two sides were "likely to be about equal").

Curtis and Cambouris do not dispute, though, that the district court correctly determined that some of the physical evidence being in Greece weighed in favor of litigating there. Still, we think that this factor alone cannot weigh "strongly" in favor of a Greek forum. The district court did not explain why this factor strongly favored litigating in Greece given that the documents could be transmitted electronically. Nor are we convinced by Galakatos's repeated emphasis that the need to translate these documents counsels strongly toward a Greek court. The same need for translation exists if this case heads to Greece, as neither Curtis nor her U.S.-based physicians speak Greek.

C. **Putting It All Together**

In review, the district court abused its discretion in failing to hold Galakatos to his burden of showing that the public and private interest factors displaced the "heavy presumption weigh[ing] in favor of [Curtis's] initial forum of choice," Adelson, 510 F.3d at 53, and that all in all, a trial in Greece

"will best serve the convenience of the parties and the ends of justice," Imamura, 957 F.3d at 107 (quoting Koster, 330 U.S. at 527). The district court clearly erred in striking the overall balance, and, in doing so, abused its discretion. See Nandjou, 985 F.3d at 147.

Before we close out, we have one more note. Below, Galakatos opposed Curtis and Cambouris's cross-motion for targeted discovery in support of their opposition to the forum non conveniens motion. Galakatos's position then was that he had given the district court enough information for it to rule in his favor.[17] However, we conclude he did not, and given that it was his heavy burden to show forum non conveniens, and given his decision below to advocate against the development of a stronger factual record, we will leave him to shoulder the burden of the inadequacy of his evidentiary offerings.[18] See Iragorri, 203 F.3d at 17 ("It is hornbook law that an appellate argument cannot survive the proponent's failure to supply a sufficient factual predicate for it."); cf. Dow v. United Bhd. of Carpenters & Joiners, 1 F.3d 56, 61 (1st Cir. 1993) (noting we are loath to "squander judicial

_____

[17] Galakatos also says, on appeal, that Curtis and Cambouris didn't ask for discovery on the witnesses issue. But Curtis and Cambouris asked for discovery on the "issues raised in the forum non conveniens motion," which would include his and his counsel's statements that the witnesses are in Greece.
[18] Galakatos has not suggested on appeal that, if we found insufficient evidence, we should remand for further factfinding.

resources and give parties who . . . plunge headlong into the merits of a case without pausing to exhaust discovery options a second bite at the cherry"); <u>Bhatnagar</u> v. <u>Surrendra Overseas Ltd.</u>, 52 F.3d 1220, 1231 (3d Cir. 1995) (holding, without enacting a blanket rule disfavoring reconsideration of <u>forum non conveniens</u> motions with new evidence, that reconsideration on an expanded record should be "limited to exceptional circumstances").

### SIGN OFF

Our voyage complete, we **<u>reverse</u>** the district court's judgment dismissing this case and **<u>remand</u>** to allow the case to proceed in the plaintiffs' chosen forum.  Costs to appellants. Fed. R. App. P. 39(a)(3).